1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| R.R.; G.J.; R.G.; all others similarly situated; and DISABILITY RIGHTS WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES; PATRICIA LASHWAY, in her official capacity as Acting Secretary of the Department of Social and Health Services; SPECIAL COMMITMENT CENTER; WILLIAM VAN HOOK, in his official capacity as Chief Executive Officer of Special Commitment Center, <br><br> Defendants. | No. <br><br> COMPLAINT |

Plaintiffs allege the following based on information and belief and investigation of counsel.

## I.  Preliminary Statement

1.     This litigation is brought by and on behalf of residents with disabilities confined at the Special Commitment Center ("SCC") who are not receiving individualized and appropriate care and treatment, including sex offender treatment, despite being committed to the facility expressly for the purpose of such treatment.

COMPLAINT - 1

2.      Specifically, residents with serious mental illness, developmental and intellectual disabilities, cognitive conditions, and brain injuries are unable to participate in or benefit from the sex offender treatment offered at the SCC due to their disability.  Treatment plans note that these residents' ability to program is impeded by their disability, but nevertheless continue to direct residents to engage in the sex offender programming in order to achieve release. Some residents have been following these treatment plans, engaging in programming for decades, with little to no progress due to their cognitive limitations.

3.      Other residents are simply unable to engage in sex offender programming at all due to serious mental illness. Treatment plans direct that these residents engage in programming once their psychiatric symptoms have remitted. However, residents are not provided with the intensive psychiatric care or rehabilitative programming required to ameliorate or address their serious mental illness. Independent inspection teams have cited the inadequacy of programming and care for residents with mental illness for years, with little to no improvement. State court records indicate that one outside evaluator opined that the SCC has provided "inadequate and negligent psychiatric mistreatment" to some of its residents.

4.      Similarly, residents who engage in potentially disruptive behaviors due to their disability are precluded from the sex offender programming until those behaviors are addressed, but are not provided with the programming and staff support required to actually address those behaviors.

5.      Residents with disabilities are thus placed in a cyclical and impossible treatment regime in which they are directed to successfully participate in sex offender treatment in order to gain release, but denied the individualized and appropriate treatment and supports necessary to do so. These residents are instead placed in highly restrictive back-wards of the facility. These

COMPLAINT - 2

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington   98104
(206) 324-1521 · Fax: (206) 957-0729

1   wards have been likened to a correctional setting by an independent inspection team, prompting

2   the team to question whether the facility is simply "warehousing" these residents rather than

3   treating them. These residents have also been subject to punitive responses to their disability

4   related behaviors, including seclusion for lengths of time "virtually unheard of in modern

5   psychiatric settings."  These residents have been forgotten, languishing in the facility for years, if

6   not decades, without receiving the care and treatment that Defendants are statutorily and

7   constitutionally required to provide, and without any realistic chance of gaining release.

8                              **II.      Jurisdiction and Venue**

9          6.      This action is brought pursuant to 42 U.S.C. § 1983 and § 12132.

10         7.      This court has jurisdiction over the subject matter of this action pursuant to 28

11   U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

12         8.      Venue in this court is proper pursuant to 28 U.S.C. § 1391.

13                                   **III.      Parties**

14         9.      Plaintiff R.R. was civilly committed to the SCC in 2004, at the age of 21. He is

15   currently in the care and custody of the Department of Social and Health Services at the SCC for

16   an indefinite period of time. He has been and continues to be injured by the acts and omissions of

17   Defendants.

18         10.     Plaintiff G.J. was civilly committed to the SCC in 2014, at the age of 21,

19   following a five year placement at the Maple Valley School, and state facility for youth involved

20   with the juvenile justice system. He is currently in the care and custody of the Department of

21   Social and Health Services at the SCC for an indefinite period of time. He has been and

22   continues to be injured by the acts and omissions of Defendants.

23

COMPLAINT - 3

1    11.     Plaintiff R.G. was civilly committed to the SCC in 2004, when he was 20. He is

2    currently in the care and custody of the Department of Social and Health Services at the SCC for

3    an indefinite period of time. He has been and continues to be injured by the acts and omissions of

4    Defendants.

5    12.     Plaintiff Disability Rights Washington ("DRW"), a non-profit corporation duly

6    organized under the laws of the State of Washington, is the state-wide protection and advocacy

7    system designated by the Governor of the State of Washington to protect and advocate for the

8    legal and civil rights of those residents of this state who have disabilities, pursuant to the DD

9    Act, 42 U.S.C. § 15041 *et seq.*, the PAIMI Act, 42 U.S.C. § 10801 *et seq.*, the PAIR Act, 29

10   U.S.C. § 794e, and the PATBI Act, 42 U.S.C. § 300d-53 *et seq.*, RCW § 71A.10.080(2). As

11   such, DRW fulfills its federal mandate by providing an array of protection and advocacy services

12   to people with disabilities across Washington, including the plaintiffs in this case. DRW is

13   governed by a board of directors comprised predominantly by people with disabilities and their

14   family members and this board is advised by two advisory councils, the Disability Advisory

15   Council and the statutorily mandated Mental Health Advisory Council, also primarily comprised

16   of people with disabilities and their family members.

17   13.     Over the past fifteen years, DRW has repeatedly engaged in advocacy and

18   litigation over the right of individuals with mental illness, intellectual or developmental

19   disabilities, brain injuries, or other cognitive conditions, to receive individualized and

20   appropriate care and treatment while confined in state institutions. In 1999, after almost two

21   years of negotiation, DRW filed *Allen v. Western State Hospital, et al.*, USDC C99-5018RJB, on

22   behalf of patients with developmental disabilities civilly confined at Western State Hospital. The

23   settlement in that case resulted in the creation of a specialized "habilitative mental health" unit,

COMPLAINT - 4

designed to provide intensive habilitative, or skill building, treatment in addition to, or instead of, the standard psychiatric care provided at the state hospital. Similar litigation, *Marr, et al., v. Eastern State Hospital*, USDC C-02-0067-WFN, was settled against Eastern State Hospital in 2002, again creating a specialized habilitative unit for patients with developmental disabilities, borderline intellectual functioning, traumatic brain injuries, and other cognitive conditions.  The settlement in that case also mandated appropriate psychiatric care and active treatment for that population as well as protection from harm. In *Rust, et al., v. Western State Hospital, et al.*, USDC C00-5749 (RJB), DRW again brought litigation against Western State Hospital regarding the care and treatment of this population, focusing on those patients confined in the forensic unit at the hospital. Again, the result was the creation of a specialized unit to provide habilitative mental health care as well as protection from harm and appropriate discharge planning.  Based on this experience, in 2014 DRW worked collaboratively with the Washington State Department of Corrections to create the Skill Building Unit at Washington Corrections Center, a specialized unit that provides targeted programming and support for inmates with traumatic brain injuries and other cognitive conditions.  DRW continues to monitor all of these institutional settings.

14.     Plaintiff DRW has received reports regarding the care and treatment of residents at the SCC for many years and, in September 2014, DRW began monitoring the facility, focusing on the care and treatment of residents with mental illness, developmental and intellectual disabilities, traumatic brain injuries and other cognitive conditions.

15.     Since that time, DRW has continued to monitor the facility and has engaged in individual and systemic advocacy in relation to SCC residents; it has also conducted investigations into the circumstances surrounding two resident deaths.

COMPLAINT - 5

16.     Defendant Washington State Department of Social and Health Services ("DSHS") operates the SCC, the only total confinement facility in the State designated to provide control, care, and treatment for individuals civilly committed pursuant to RCW 71.09.

17.     Defendant Patricia Lashway is Acting Secretary of DSHS and is sued in her official capacity. Defendant Lashway is responsible for the administration of Defendant SCC.

18.     Defendant SCC is a total confinement facility that is charged with providing control, care, and treatment for individuals civilly committed to the facility pursuant to RCW 71.09. Defendant SCC is located on McNeil Island, in Pierce County.

19.     The SCC's biennial budget for fiscal years 2016 and 2017 is $74,946,000.

20.     In 2013, SCC estimated that the cost of confining a resident at the facility is $151,770 per year.

21.     Defendant William Van Hook is the Chief Executive Officer of the SCC and is sued in his official capacity. Defendant Van Hook replaced former CEO Mark Strong in April 2016 and as the SCC's current CEO, Defendant Van Hook is directly responsible for oversight, operation and management of Defendant SCC and the control, care and treatment for residents confined at that facility.

## IV.     Statement of Facts Entitling Plaintiffs to Relief

**A.     Defendants have a duty to provide individualized and adequate care and treatment to people confined at the SCC.**

22.     Section 71.09 of the Revised Code of Washington ("RCW") governs the procedures for committing individuals to the SCC for indefinite care and treatment.

COMPLAINT - 6

23.    Under that section, Defendant SCC is defined as a total confinement facility and charged with providing for the control, adequate care and individualized treatment for residents committed to the facility. RCW § 71.09.060(1); RCW § 71.09.080(3).

24.    An individual may be committed to the SCC following a judicial finding that he or she is a "sexually violent predator" in that he or she has been convicted of or charged with a crime of sexual violence and suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility. RCW § 71.09.020(19); RCW § 71.09.060.

25.    While such commitment is indeterminate, a resident's continuing need for commitment may be reassessed through an annual review process. RCW § 71.09.070; RCW § 71.09.090. This annual review includes a determination of whether a person's condition has changed sufficiently that the resident no longer meets the definition of a sexually violent predator or that conditional release to a less restrictive alternative is in the resident's best interest and conditions can be imposed that adequately protect the community. *Id.*

26.    The annual review includes a record review and an evaluation of the resident by a psychologist appointed by the SCC, after which an annual review report is issued.

27.    During this periodic review, an individual may show that his or her condition has changed by presenting evidence that there has been a change in his or her mental condition brought about through positive response to continuing participation in treatment or by demonstrating that there has been a permanent physiological change, such as paralysis, stroke, or dementia, that renders the person unable to commit a sexually violent act. RCW § 71.09.090(4)(b).

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington   98104
(206) 324-1521 · Fax: (206) 957-0729

28.     In July 2015, the treatment in which an individual must engage in order to gain release was legislatively limited to the sex offender specific treatment program ("SOT program") offered at the SCC. RCW § 71.09.020(20).

29.     As a total confinement facility, the SCC is not a state licensed psychiatric facility nor is it accredited by the Joint Commission, an independent organization that accredits many other treatment facilities such as hospitals and nursing homes. Instead, the external oversight for SCC treatment and programming is provided by the Inspection of Care ("IOC") team, a statutorily created group charged with conducting an annual inspection of the SCC. WAC § 388-881-025.

30.     After each inspection, the IOC team issues a report ("IOC Report"), identifying areas of progress and continuing concern. The IOC has no authority to compel SCC to comply with its recommendations. The SCC has persistently ignored these reports and recommendations.

31.     The 2014 IOC team noted that despite finding deficiencies year after year, the SCC's response to many of the IOC team's recommendations has been "slow to non-existent." (2014 IOC Report).

32.     The 2015 IOC report noted that resident progress through the treatment program remained slow and that the SCC continued to provide insufficient psychiatric and medical coverage. (2015 IOC Report). Notably, while the 2015 IOC report noted that treatment program hours have increased to more than eight hours for the special needs population, that finding was not supported by DRW's investigation.

**B.     Defendants fail to provide appropriate and individualized care and treatment at the SCC.**

    **1)   Plaintiffs and Plaintiff DRW's constituents are subject to unreasonable conditions of confinement.**

COMPLAINT - 8

33.     SCC residents are assigned to living units according to their behavior and engagement in treatment.

34.     Many individuals with mental illness, intellectual or developmental disabilities, brain injuries and other cognitive conditions, including Plaintiffs and Plaintiff DRW's constituents, have been assigned to Program Area One, defined by the SCC as a high management area. This program area includes seven units: Alder North, Alder South, Alder West, Birch, Cedar North, Cedar South and Cedar West.

35.     The IOC team has repeatedly found that there is inadequate programming occurring in Program Area One, with Alder North providing "no obvious treatment" in a unit "more reminiscent of a correctional setting than a treatment facility." (2013 and 2014 IOC Reports). Some of the "programming" offered includes coloring and Sudoku.

36.     While the 2015 IOC report noted that the living units in Program Area One "are no longer sterile in appearance," it is unclear what such an assessment is based on. (2015 IOC Report). During DRW's most recent monitoring visits, which occurred after the IOC's visit, there was little to no change in the appearance of these units, which remain bare and institutional.

37.     Defendants have insufficient staffing in Program Area One and the staff that is present in that area is not adequately trained to address the daily needs of residents with mental illness, intellectual or developmental disabilities, brain injuries or other cognitive disorders.

38.     SCC staff impose punitive and unreasonable external behavioral controls on Plaintiffs and Plaintiff DRW's constituents, which are described in documents labeled "Current Conditions."

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington   98104
(206) 324-1521 · Fax: (206) 957-0729

39.     Current Conditions have been used to order Plaintiffs and Plaintiff DRW's constituents be locked in their units, and even their own rooms, for extended periods, sometimes for as many as twenty one hours per day.

40.     Current Conditions have also been used to limit personal property for some residents in Program Area One; even that minimal property is subject to removal as a means of punishment. Plaintiffs and Plaintiff DRW's constituents have been forced to earn back basic necessities such as extra clothing and bedding as part of a Current Condition. These property restrictions have been so severe that some residents are required to "check out" three crayons at a time from the staff desk. However, these same residents are often restricted from approaching the staff desk more than a few times per shift.

41.     Current Conditions have also been used to limit a resident's ability to enter their room, with one resident forced to be out of his room from 7 am until 10 pm, with only two designated thirty minute periods in which he can be alone in his room.

42.     Current Conditions documents are often renewed and extended for weeks, if not months or years.

43.     Use of these punitive Current Conditions is a substantial departure from accepted professional judgment, standards or practice and demonstrates that Defendants did not base their decisions on clinical judgment.

**2)   Plaintiffs and Plaintiff DRW's constituents are subject to punishment in response to their disability related behaviors.**

44.     Plaintiffs and Plaintiff DRW's constituents are routinely given behavior management reports (BMRs), or infractions, for behaviors that are related to their mental illness, intellectual or developmental disability, brain injury or other cognitive disability.

COMPLAINT - 10

45.     The behaviors for which SCC residents have received infractions include failing to follow staff directives, feeding wildlife, sharing food with other residents, hugging other residents, self-harm and suicide attempts, exposing themselves, verbal aggression, and staff and peer assault.

46.     These BMRs result in lost privileges, including limited property and movement within the facility.

47.     Plaintiffs and Plaintiff DRW's constituents have been frequently placed in seclusion in the intensive management unit (IMU) in response to disability related behaviors, often for days, even weeks, at a time. Behaviors for which residents have been placed in the IMU for extended periods include failing to follow staff directions, hugging another resident, and engaging in self-harm.

48.     The SCC's use of the IMU is punitive and counter-therapeutic, with extended placements that are "virtually unheard of in modern psychiatric settings." (2012 IOC Report).

49.     Though the IOC team cited SCC for its use of the IMU in 2012, the SCC continued secluding residents in the IMU for years.

50.     The 2014 IOC Report found that the SCC's use of the IMU was "outside the standard of practice."

51.     Though the SCC is in the process of implementing new policies governing seclusion and restraint, facility records demonstrate that the IMU, now re-named the Alternative Placement Unit, has continued to be utilized, albeit less frequently, over the course of DRW's monitoring.

52.      Plaintiffs and Plaintiff DRW's constituents have also been subject to seclusion in their rooms, or in other rooms on the living unit.

COMPLAINT - 11

53.     Though the IOC team cited the facility for secluding residents in their rooms in 2012, the facility continued to engage in the practice for years.

54.     One DRW constituent spent much of 2015 locked in his room for more than twenty hours of the day; the window to his cell is covered by cloth on the outside, blocking his view of the other residents on the unit and completely isolating him from human contact. SCC's policy regarding seclusion was not followed during that time.

55.      During that time, this constituent was released to the unit in restraints for a few hours per day and segregated from other residents even during this out-of-cell time. The only personal possessions that he had in his cell were a bible and a radio. To the extent that any programming is offered on his unit, records reflect that he only participated by listening through his cuff port.

56.     Other DRW constituents have been routinely directed to stay in their rooms every other hour, leaving them segregated for half of each day, for weeks or months on end.

57.     Defendants' use of seclusion, both within the IMU and on residential units, deviates substantially from generally accepted professional judgment, standards or practice and demonstrates that Defendants did not base their decisions on clinical judgment.

### 3) Plaintiffs and Plaintiff DRW's constituents with mental illness are not receiving appropriate psychiatric care and mental health treatment at the SCC.

58.     Since at least 2010 the IOC team has consistently cited the SCC for failing to provide adequate psychiatric care and programming to its residents with mental illness and has cautioned that the SCC may be simply "warehousing" its residents with mental illness. (2012 IOC Report). In the most recent 2015 IOC report, the team found that the psychiatric coverage provided at the SCC fails to meet "a professional standard." (2015 IOC Report).

COMPLAINT - 12

59.     Despite the IOC team's repeated warnings, and DRW's investigation and monitoring, Defendants continue to fail to provide psychiatric services of adequate frequency, duration, and substance to meet the mental health needs of Plaintiffs and Plaintiff DRW's constituents.

60.     Defendants do not have sufficient staff with specialized training to address the daily needs of Plaintiffs and Plaintiff DRW's constituents with serious mental illness.

61.     Until August 2015, the only staff psychiatrist employed by the SCC also served as the medical director for the facility. This limited staffing was noted as an area of concern by the 2014 IOC team. In August 2015, that psychiatrist left and no replacement was hired. Instead, Defendants contracted with a series of psychiatric providers who were rarely at the facility and offered primarily medication authorization.

62.     Even when there was a staff psychiatrist, the only mental health intervention many residents with mental illness received was a monthly fifteen minute session with the psychiatrist and psychiatric medication.

63.     In 2014 the IOC team noted "major gaps" in the psychiatric documentation, and stated that there was a need for more "sophisticated interventions," when resident behavior did not respond to prescribed medications. An outside evaluator has described the psychiatric medication administration at the SCC as "chaotic psychopharmacology."

64.     Though Defendants finally hired a Psychiatrist in the summer of 2016, that provider was not full time, contrary to the IOC's recommendation that "there needs to be between 1 and 1½ full time psychiatric positions to meet minimal needs" of the residents at the SCC. (IOC Report 2015). Moreover, the current provider is only under contract until the end of the calendar year.

COMPLAINT - 13

65.     Due to Defendants' failure to appropriately assess and treat residents with mental illness, Plaintiffs and Plaintiff DRW's constituents have suffered cognitive decline while confined at the SCC for care and treatment.

66.     State court records reflect that one of DRW's constituents has been diagnosed with a traumatic brain injury, dementia due to head trauma, with behavioral disturbance, and Psychotic Disorder not otherwise specified, among other disorders. He has been confined for over two decades at the SCC, since the age of 19.

67.     While under SCC's care, his mental status has deteriorated. Outside evaluators have opined that over the past twenty years at the SCC, this resident has been the subject of "malpractice" and that the facility has failed to provide appropriate psychiatric care, therapy specific to individuals with brain injuries, and needed rehabilitative services.

68.     In 2013 this constituent was placed frequently in the IMU for disability related behaviors, sometimes for more than a month at a time; in fact, court records reflect in 2013 and 2014, he spent 276 out of 413 days in segregation. However, as one outside evaluator in his case noted "'Punishment treatment' and solitary confinement to force compliance with authority's expectations have no place in the treatment of a severely mentally ill person."

69.     During his time in segregation, this constituent was noted as being unresponsive, often lying in a soiled bed for hours at a time. The SCC psychiatrist's response to these behaviors was to assess him for malingering. Outside evaluators have opined that this constituent has been subject to inadequate and negligent psychiatric mistreatment at the SCC.

70.     Court records reflect that another one of Plaintiff DRW's constituents, a resident with a serious mental illness, has been locked in his room for much of 2015. He was essentially isolated, communicating with staff via an intercom and receiving his meals through his cuff port.

COMPLAINT - 14

When he was released from his room for a few hours per day, he remained in ankle restraints and the unit was cleared of other residents.

71.     Treatment plans for some of DRW's other constituents indicate that they have serious mental illness and are not provided with appropriate programming related to their mental health condition and rarely see the facility's sole treating psychiatrist. They have instead been locked in their rooms for large parts of each day in units which were likened to a correctional setting by the IOC team.

72.     Treatment plans for another constituent, now deceased, indicate that upon his admission to the SCC in 2012, he was able to engage in the SOT programming at the facility and manage his behavior. In 2013 he was placed in the IMU for suicidal thoughts. He was thereafter moved to Alder North and repeatedly sent to the IMU for self-harm and assaultive behavior. Treatment plans and psychiatric notes from 2013 indicate that he became delusional and was experiencing active psychosis. During that time, the resident was prescribed antipsychotic medication to little effect, and was seen with decreasing frequency by the facility psychiatrist. In fact, psychiatric notes from that time period direct simply that "current care" be continued, with no additional psychiatric interventions provided, despite the resident's worsening and unexplained psychosis. That resident unexpectedly died in February 2016.

73.     Defendants' failure to provide adequate mental health care to Plaintiffs' and Plaintiff DRW's constituents with serious mental illness precludes these individuals from participating in and benefitting from the SOT program.

74.     The mental health care provided to Plaintiffs and Plaintiff DRW's constituents falls far outside the generally accepted professional judgment, practice or standards in treating

COMPLAINT - 15

individuals with serious mental illness and demonstrates that the Defendants did not base their decision on such professional judgment.

**4) Defendants fail to provide appropriate and individualized SOT programming at the SCC.**

75.     The core sex offense treatment program at the SCC consists of five phases of treatment.

76.     This core sex offense program is set forth in the "Blue Book" and relies heavily on reading and completing written assignments.

77.     Residents that are unable to understand or complete the assignments in the core sex offense program cannot progress through the phases of the program.

78.     Residents with learning disabilities, cognitive disorders, severe mental illness or an intellectual disability may be offered a "special needs" track SOT program at the SCC.

79.     This special needs track covers five treatment domains, including Cooperation with Supervision, Activities of Daily Living, Coping Skills, and Sex Offense Specific Treatment.

80.     There are five "stages of change," (SOC) or treatment phases in the special needs track. In order to advance through the phases, a resident must make progress in all five domains and the resident's SOC is determined by averaging their scores in all five domains.

81.     There are no objective criteria used to determine when a resident has completed a SOC.

82.     In 2011 the IOC team identified as a "top priority" the need to increase the program hours for the special needs track SOT program to at least four hours per week.

83.     The IOC team's 2012 report again addressed the limited hours and programming available to residents with special needs, noting the "substandard level of performance" and

COMPLAINT - 16

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington   98104
(206) 324-1521 · Fax: (206) 957-0729

1  anticipating that the longer a diminished level of programming was provided the more

2  "acceptable" it would appear to the SCC and the State to provide inadequate programming.

3      84.    In 2014, the special needs track SOT program was scheduled to meet for one hour

4  and fifteen minutes, three times per week.

5      85.    In 2015, the special needs track SOT program was scheduled to meet for one hour

6  and fifteen minutes, two times a week; a designated time at which residents may work on

7  homework assignments was scheduled twice per week for a total of two and a half hours as well.

8  However, special needs residents report that they do not receive homework.

9      86.    In 2016, the special needs track SOT program was again scheduled for one hour

10  and fifteen minutes, twice per week, with an additional two and a half hour period once per week

11  designated as "Homework Group." However, resident records reflect that additional classes such

12  as Knitting and Music Appreciation are also scheduled during this "Homework Group," in the

13  same room at the very same time.

14      87.    SOT groups are frequently cancelled due to staff shortages, treatment breaks, and

15  other external factors.

16      88.    Treatment groups for the special needs population were cancelled in the summer

17  of 2016 due to staff shortages, with the 2015 IOC report noting a forty percent staff vacancy rate

18  at the SCC. (IOC 2015).

19      89.    Other "specialty groups" and activities such as arts and crafts and karaoke are

20  sporadically offered to the special needs population.

21      90.    These specialty groups and activities are offered based on availability of staff, not

22  the needs of residents.

23

COMPLAINT - 17

91.     According to waivers signed by residents, specialty groups are not considered SOT programming and do not count as treatment sufficient to lead towards release from the SCC.

92.     SCC policy states that following three unexcused absences, residents in the special needs SOT program may be suspended from the group.

93.     Plaintiffs and Plaintiff DRW's constituents with memory impairments, cognitive disabilities, and borderline intellectual functioning have been noted as having unexcused absences and suspended from the SOT program.

94.     SCC policy anticipates that residents may be precluded from entering the SOT program, or asked to leave the group, due to disability related behaviors; such residents remain suspended until the behaviors are "addressed."

95.     Plaintiffs and Plaintiff DRW's constituents have been precluded from programming or removed from group due to disability related behaviors, including violating group confidentiality, "instability," exposing themselves, "disruptive" behavior, lack of impulse control, inability to manage emotions, and "behavioral dysregulation."

96.     Plaintiffs and Plaintiff DRW's constituents on unit restrictions or in the IMU due to behavioral issues related to their disability have also been prevented from attending special needs SOT programming.

97.     The policies and procedures governing participation in the special needs SOT programming effectively preclude Plaintiffs and Plaintiff DRW's constituents from engaging in the special needs SOT program due to their disabilities.

COMPLAINT - 18

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington   98104
(206) 324-1521 · Fax: (206) 957-0729

98.     Defendants have not modified the policies or procedures governing participation in the special needs SOT programming in order to accommodate Plaintiffs' and Plaintiff DRW's constituents' disabilities.

**Plaintiff R.R.**

99.     R.R. has been diagnosed with a Major Neurocognitive Disorder due to traumatic brain injury, among other disorders.

100.    Shortly after R.R.'s placement at the SCC in 2004, SCC staff suggested cognitive testing in order to determine the best course of treatment in light of his brain injury; such testing has never been performed.

101.     SCC staff have also suggested individual therapy in light of R.R.'s brain injury; such therapy has never been offered.

102.    R.R. has languished at the SCC for more than a decade with little to no appropriate or individualized treatment, sex-offender specific or otherwise. Instead of treatment, R.R. has been subject to harsh behavioral interventions, including being placed in the IMU and locked in his room for large portions of the day, for weeks, if not months, on end. He rarely leaves his unit and engages in little to no programming.

103.    Plaintiff R.R. is not currently receiving adequate care and treatment at the SCC, nor is he receiving individualized treatment that gives him a realistic opportunity to be cured or improve his mental condition.

**Plaintiff R.G.**

104.    Plaintiff R.G. was admitted to the SCC in 2004, at the age of 20.

105.    Plaintiff R.G. has been diagnosed with a moderate to severe Intellectual Disability, among other diagnoses. He has been assessed at the SCC as having academic

COMPLAINT - 19

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington   98104
(206) 324-1521 · Fax: (206) 957-0729

1  functioning at a first or second grade level.  His functional impairment was described as "quite

2  profound" in a recent psychological evaluation.

3      106.    R.G. has participated in the SOT program at the SCC intermittently for more than

4  a decade, where he remained in phase one. Plaintiff's counsel raised concerns about how long he

5  had been at phase one in October 2015 and he had been moved to phase three of the program by

6  July 2016.

7      107.    In 2014 R.G. asked his case manager to read documents to him, including

8  homework assignments from the special needs SOT program and his treatment plan; his case

9  manager opined that R.G. was unable to read any of the documents.

10     108.    Despite Senior Clinical Team notes indicating that it would be "counter-

11  therapeutic" to continue behavioral restrictions for R.G., restrictive Current Conditions have

12  remained in place and R.G. continues to be housed in the high management units at SCC, with

13  behavioral restrictions and limited possessions.

14     109.    R.G.'s recent annual review concluded that he likely did not possess the cognitive

15  ability to engage in cognitive based SOT therapy and that he would benefit from modeling and

16  positive reinforcement, as well as increased staff training regarding how to work with his

17  limitations.

18     110.    The annual review further noted that R.G.'s current environment is not equipped

19  to meet his individual needs or protect him from victimization.

20     111.    R.G.'s current treatment plan at the SCC continues to focus on following facility

21  rules, controlling his conduct and attending to hygiene, completing the cognitive based SOT

22  program, and adhering to restrictive Current Conditions. Interventions to address R.G.'s

23  cognitive limitations are not included in the treatment plan and his inability to complete

COMPLAINT - 20

treatment assignments is inappropriately attributed to a lack of motivation, not his identified intellectual disability.  The treatment plan makes no mention of how SCC plans to address R.G.'s apparent inability to read or comprehend his treatment documents.

112.    Plaintiff R.G. is not currently receiving adequate care and treatment at the SCC, nor is he receiving individualized treatment that gives him a realistic opportunity to be cured or improve his mental condition.

**Plaintiff G.J.**

113.    G.J. has been diagnosed with an Intellectual Disability, and alcohol related Neurodevelopmental Disorder, as well as a series of other associated neurodevelopmental disorders.

114.    Plaintiff G.J.'s underlying sex offense occurred when he was 16; he completed a five year juvenile commitment at Maple Lane and was transferred to SCC at the age of 21.

115.    Both the SCC clinical team and outside evaluators have determined that G.J. may benefit from individual therapy rather than group therapy in light of his intellectual disability and cognitive deficits.

116.    In 2013, G.J. was receiving 45 minutes per week of group therapy and one half hour visit from his therapist per month.

117.    G.J. has enrolled in the special needs SOT program but as of August 2016, that program was not operating due to staff shortages.

118.    Treatment plans note that G.J.'s intellectual disability and cognitive impairments "impede his ability to focus in the group setting, understand treatment concepts, and apply the treatment concepts to daily living."

COMPLAINT - 21

119.    A 2014 evaluation found that G.J.'s continued behavioral issues may be the result of his "grossly impaired, enduring executive functioning."

120.    Plaintiff G.J. is not currently receiving adequate care and treatment at the SCC, nor is he receiving individualized treatment that gives him a realistic opportunity to be cured or improve his mental condition.

**DRW Constituent J.L.**

121.    J.L. is a DRW constituent and has been diagnosed with an Intellectual Disability as well as Borderline Personality Disorder; he also has an extensive history of serious self-harm.

122.    J.L. is currently attending the special needs SOT programming but has been removed from group due to behavior issues in the past.

123.    Staff have noted that J.L. has difficulty understanding concepts, particularly in the group setting, and is unable to complete assignments properly.

124.    While staff have considered contacting Western State Hospital for suggestions as to how to treat J.L., his treatment at the SCC has remained essentially unchanged since his arrival, with increasingly strict behavioral interventions and little to no advancement through the SOT program.

125.     J.L. has never been offered individual SOT therapy nor has the SCC staff provided other accommodations that would assist J.L. in accessing appropriate treatment.

126.    According to SCC documents, J.L.'s self-harm and cognitive limitations continue to impede his ability to engage in treatment.

127.    When J.L. has been terminated from the special needs SOT program in the past, his treatment at the SCC has consisted of one thirty minute case management session per month.

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington  98104
(206) 324-1521 · Fax: (206) 957-0729

128.    J.L. is not receiving adequate psychiatric care at the SCC to address his serious mental illness and enable him to participate in the SOT program.

129.    J.L. is not receiving the appropriate habilitative programming necessary to address his cognitive disabilities and related behaviors.

130.    J.L. is not currently receiving adequate care and treatment at the SCC, nor is he receiving individualized treatment that gives him a realistic opportunity to be cured or improve his mental condition.

**DRW Constituent R.H.**

131.    R.H. is a DRW constituent and has been diagnosed with an intellectual disability but, despite being at the SCC for over fifteen years, there has never been a formal assessment of his adaptive functioning.

132.    R.H. has engaged in the SOT programming at the SCC since his admission to the facility.

133.    Despite being in the special needs track SOT program, R.H. has been repeatedly noted to have difficulties understanding concepts; he has also repeated phases of treatment due to his behavior or limited understanding.

134.    R.H. has been asked to leave group due to his behaviors on multiple occasions.

135.    After ten years in treatment, in 2010, SCC staff finally noted R.H.'s slow progress in treatment.

136.    Similar notes were made in subsequent years; possible explanations for R.H.'s lack of progress in treatment that were offered by SCC staff included the possibility that assignments are too difficult for him, procrastination, lack of understanding the content and context of materials, or inability to write.

COMPLAINT - 23

137.    Despite perfect attendance in multiple treatment cycles, staff confusion regarding R.H.'s failure to progress continued throughout 2014.

138.    R.H. was in treatment phase two in November 2014, after almost fifteen years of engaging in the treatment offered at the SCC.

139.    Treatment plans for that year recognize that R.H.'s intellectual disability limits his ability to understand the SOT programming; no clear plan was implemented to address this continuing concern.

140.    Though resident R.H. is continuing to participate in the SOT programming, he is not currently receiving adequate care and treatment at the SCC, nor is he receiving individualized treatment that gives him a realistic opportunity to be cured or improve his mental condition.

**Other Constituents of Plaintiff DRW**

141.    Each of the individual plaintiffs are constituents of Plaintiff DRW as are all other individuals with cognitive disabilities who are denied adequate treatment, and the issues identified by the individual plaintiffs are representative of the legal violations and harms suffered by Plaintiff DRW's constituents.

142.    DRW constituents spend years, some over a decade or two, with little or no appropriate treatment at the SCC.

143.    Some DRW constituents even get worse under the care of Defendants.

144.    DRW constituents are not able to participate in either group SOT programming or individual therapy due to their disabilities, and their treatment plans often include a continuing direction to participate in SOT programming, but provide no alternative options that take into account their disability related needs.

COMPLAINT - 24

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington  98104
(206) 324-1521 · Fax: (206) 957-0729

145.     Some DRW constituents came from Western State Hospital where Defendant DSHS was providing psychiatric treatment. When transferred to the SCC, these constituents were not provided with adequate mental health treatment.

146.     Defendants' senior clinical staff are aware DRW constituents are not provided with appropriate treatment.

147.     DRW constituents are subject to unreasonable restraint and harsh conditions.

148.     Plaintiffs and Plaintiff DRW's constituents are required to participate in the SOT programming at the SCC in order to be considered for release

149.     Defendants have not provided reasonable modifications to accommodate Plaintiffs' and Plaintiff DRW's constituents' disabilities and enable them to participate in and benefit from the SOT programming at the SCC.

150.     Plaintiffs' and Plaintiff DRW's constituents' inability to participate in SOT programming due to mental illness, intellectual disability, brain injury and other cognitive disorders prevents them from meeting the statutorily required criteria for release.

151.     The failure to provide constitutionally and statutorily adequate and individualized sex offender treatment is a substantial departure from accepted professional judgment, practice or standards and demonstrates Defendants did not base their decision on professional judgment.

### V.     Class Allegations

152.     **Definition of Class.** The class consists of all SCC residents whom SCC clinical has assessed as:

(1) demonstrating one or more of the following criteria:

(a) a full scale IQ score of less than 80;

(b) executive functioning that is objectively and measurably below normal limits;

COMPLAINT - 25

(c) a documented history of serious mental illness, developmental disability, intellectual disability, borderline intellectual functioning, traumatic brain injury or other cognitive condition that could impair his or her ability to function in the conventional treatment track;

(d) audio, visual or language impairments that may hinder his or her functioning in a conventional treatment track;

(e) a learning disorder that could interfere with his or her functioning in the conventional treatment track; or

(f) developmental, cognitive, or emotional treatment-interfering factors that currently impact his or her ability to effectively engage in conventional track treatment; and

(2) clinically appropriate for the SCC's habilitative treatment program for special needs residents.

163. **Size of Class.** The class of SCC residents with serious mental illness, developmental or intellectual disabilities, traumatic brain injuries or other cognitive conditions for whom a specialized habilitative mental health program is appropriate is expected to be so numerous that joinder of all members is impracticable. Through interviews with residents and review of clinical records, Disability Rights Washington has identified at least seventeen (17) residents who likely fall within this group and there may be more that have not yet been identified.

164. **Class Representatives.** Named Plaintiffs R.R., G.J., and R.G. each have either a mental illness, developmental or intellectual disability, traumatic brain injury, or other condition that makes it difficult for them to meaningfully understand and participate in the sex offender treatment program currently offered at the SCC. Each named plaintiff has resided in Program Area

COMPLAINT - 26

One, the most restrictive housing at SCC, for some period of time and have therefore been subject to the harsh conditions of those living units. The named Plaintiffs have also been subject to "Current Conditions" which restricted their possessions or movement within the facility. G.J. has been recognized as a "vulnerable adult" by the SCC. R.R. has been precluded from participating in programming due to disability related behaviors and R.G., despite participating in the specialized sex offender training currently offered at the SCC, has been unable to understand and progress in that treatment, due to his disability. Each of the named Plaintiffs have been languishing at the facility for years, R.R. and R.G. for more than a decade, without access to the individualized and appropriate treatment to which they are constitutionally and statutorily entitled. Their claims are therefore typical of the claims of the other members of the class, and they will fairly represent the interests of the class. There is no known conflict of interest among the class members.

165. **Common Questions of Law and Fact**. This action requires the determination of whether Defendants violated the 14th Amendment of the U.S. Constitution, the Rehabilitation Act, and the Americans with Disabilities Act by failing to provide appropriate and individualized treatment to SCC residents with serious mental illness, intellectual and developmental disabilities, traumatic brain injuries, and other cognitive conditions, instead subjecting those residents to harsh, punitive, and unreasonable conditions of confinement.

166. **Defendants Have Acted on Grounds Generally Applicable to the Class.** Defendants have failed to create a habilitative treatment program designed for, and accessible to, residents with serious mental illness, intellectual and developmental disabilities, traumatic brain injuries, and other cognitive conditions. Defendants have failed to provide appropriate psychiatric care or behavioral supports to these residents and have punished them for disability related behavior, subjected them to restrictive living conditions, even segregation and restraint, and left

COMPLAINT - 27

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington  98104
(206) 324-1521  ·  Fax: (206) 957-0729

them to languish in the facility for years. Because Defendants have acted on grounds generally applicable to the class, declaratory relief is appropriate for the whole class. Certification is therefore proper under Fed. R. Civ. P. 23(b)(2).

168.   **Class Counsel.**  Plaintiff has retained experienced and competent class counsel.

## VI.     Claims for Relief

### Count I:
**Failure to provide reasonable conditions of safety and freedom from unreasonable restraint in Violation of the Fourteenth Amendment of the United States Constitution**

169.   The allegations of the paragraphs above are incorporated herein.

170.   The Fourteenth Amendment guarantees that "[n]o state shall deprive any person of life, liberty or property, without due process of law." U.S. Const. Amend XIV, § 1.

171.   Defendants' acts and omissions have violated Plaintiffs' and Plaintiff DRW's constituents' right to due process by failing to provide them with reasonable conditions of safety and freedom from unreasonable restraint in a treatment facility, including confining them in excessively harsh conditions, imposing punitive interventions in response to disability related behaviors, and failing to provide adequate mental health treatment.

172.   The conditions of confinement imposed by Defendants are such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the conditions imposed are not based on professional judgment.

### Count II:
**Failure to Provide Treatment in Violation of the Fourteenth Amendment of the United States Constitution**

173.   The allegations of the paragraphs above are incorporated herein.

COMPLAINT - 28

174.    The Fourteenth Amendment of the United States Constitution guarantees that "[n]o state shall deprive any person of life, liberty or property, without due process of law." U.S. Const. Amend XIV, § 1.

175.    The Defendants' acts and omissions violate Plaintiffs' and Plaintiff DRW's constituents' due process right to such treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition by subjecting them to punitive, non-therapeutic conditions of confinement, failing to provide adequate mental health programming and psychiatric care, and failing to provide individualized, appropriate SOT treatment tailored to address their particular needs.

176.    The Defendant's failure to provide individualized and appropriate treatment to the Plaintiff and Plaintiff DRW's constituents prevents them from meeting the statutory criteria for release from the SCC.

177.    Due process further requires that the nature and duration of confinement bear a reasonable relation to the purpose for which a person is committed.

178.    The nature of Plaintiffs' and Plaintiff DRW's constituents' continued confinement at the SCC does not bear a reasonable relation to the purpose for which they were committed, namely SOT treatment.

179.    Defendants' provision of care and treatment is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the conditions imposed are not based on professional judgment.

## Count III:
### Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

180.    The allegations of the paragraphs above are incorporated herein.

COMPLAINT - 29

181.     Plaintiffs and Plaintiff DRW's constituents are all "qualified individuals with a disability" within the meaning of 42 U.S.C. § 12131(2) and are "otherwise qualified individuals with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 794.

182.     Defendant DSHS is a public entity a defined by 42 U.S.C. § 12131(1)(a). Defendant DSHS receives federal financial assistance, and Defendant is thus subject to the provisions of the Rehabilitation Act.

183.     Defendant DSHS operates Defendant SCC for the purposes of control, care and treatment of residents committed to the facility.

184.     Defendants discriminate against Plaintiffs and Plaintiff DRW's constituents on the basis of disability by excluding them from SOT participation due to their disability and fail to provide needed accommodations or modifications in policies, practices and procedures such that they may participate in and benefit from the SOT programming at the SCC.

185.     Reasonable modification of Defendants' policies, practices and procedures would not fundamentally alter the nature of their services, programs or activities but rather would further Defendants' stated goal of providing individualized and appropriate care and treatment to the Class.

### VII.     Prayer for Relief

186.     Wherefore, Plaintiffs request that this Court:

187.     Issue a declaratory judgment that the conduct, conditions, and treatment described in the complaint violate Plaintiffs' constitutional rights in the manner identified in this complaint.

188.     Issue a permanent injunction restraining Defendants from violating the Fourteenth Amendment and the Americans with Disabilities Act in providing care and treatment at the SCC.

Disability Rights Washington
315 5th Avenue South, Suite 850
Seattle, Washington  98104
(206) 324-1521 · Fax: (206) 957-0729

189.    Issue an award for Plaintiffs' costs, litigation expenses, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205.

190.    Such other and further relief as this Court may deem just and equitable.

Dated:  February 1, 2017.

**DISABILITY RIGHTS WASHINGTON**

*/s/ David Carlson*
*/s/ Rachael Seevers*
*/s/ Anna Guy*
*David R. Carlson*, WSBA No. 35767
Rachael Seevers, WSBA No. 45846
Anna Guy, WSBA No. 48154

**CARNEY GILLESPIE ISITT PLLP**

*/s/Christopher Carney*
*/s/Sean Gillespie*
*/s/Kenan Isitt*
Christopher Carney, WSBA No. 30325
Sean Gillespie, WSBA No. 35365
Kenan Isitt, WSBA No. 35317
600 First Ave., Suite LL08
Seattle, WA  98104
(206) 445-0220

**Attorneys for Plaintiffs**

COMPLAINT - 31